In the Interest of N.C., a Minor.

Appeal of N.C., Appellant.

Superior Court of Pennsylvania.

Argued June 26, 2013.

Filed Aug. 8, 2013.

Reargument Denied Oct. 1, 2013.

Patrick Lavelle, Du Bois, for appellant.

Jeffrey D. Burkett, District Attorney, Brookville, for Commonwealth, participating party.

BEFORE: SHOGAN, LAZARUS and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.:

N.C. (a minor) appeals from the dispositional Order entered following his adjudication of delinquency for aggravated indecent assault, 18 Pa.C.S.A. § 3125(a)(7). We vacate the dispositional Order and remand for further proceedings.

In its Opinion, the juvenile court summarized the history underlying the instant appeal as follows:

> [J.N. ("Mother")] is the mother of two minor children, [A.D.], date of birth March 21, 2008, and [S.D.]. She lives in Brockway, Jefferson County, Pennsylvania. . . .
>
> The two minor children's parental grandmother is [S.H. ("Grandmother"),] who has lived since January 2011, with her boyfriend[, Nathan,] on Bond Street in Brockway ["the Bond Street house"]. Before moving in with [Nathan], [Grand-

mother] lived in another house in Brockway and she often babysat and kept her grandchildren overnight to accommodate [Mother's] work schedule.

On November 5, 2011, [Mother] dropped her two children off at [the Bond Street] house[ ] around 8:30 a.m. She indicated that she was done with work around 12:30 p.m. and that sometime that afternoon, around 3 or 3:30, [Grandmother] called and said [A.D.] was upset and wanted to go home. [Mother] took the few minute drive to [the Bond Street house] and noticed that "all were out on the porch" and that [A.D.] was upset to the extent she either was crying or had just [finished] crying. [Mother] took [A.D.] home[,] where she described [A.D.] as not being herself, laying around and watching cartoons on TV. At some point[, Mother] sat in the room to watch cartoons with her daughter. . . . [Mother] estimated this to be about an[ ] hour and a half after she picked [A.D.] up from [the Bond Street house.]

Without any conversation, [A.D.] said "my pee pee hurts." After that[, Mother] asked "what's wrong" to which [A.D.] responded[,] "[N.C.] touched me."

[Mother] engaged in no more discussion with the minor child, but instead called Nathan, [who is] the father of [N.C.] Upon calling [Nathan], she asked if [N.C.] was present at [the Bond Street house,] to which [Nathan] responded "no." She then had [A.D.] drop her pants and look[ed] at her genital area, noticed it was red in the center, which she thought was a rash[,] so she applied Vaseline to it. She did no further care or investigation on that date because she assumed it was impossible for [N.C.] to have touched [A.D.] when he was not present at [the Bond Street house]. However, several days later, [Nathan] told her [that N.C.] . . . was present at [the Bond Street house] on the date and time in question. When she found out [N.C.] was present, as soon as possible thereafter, [Mother] took her daughter to the Brockway Police Department and discussed the matter with Chief Terry Young and this investigation and allegation ensued.

On several occasions since that November time frame and after the child having been interviewed at Western Pennsylvania Cares, [Mother] has experienced the child at least two or three times saying that "[N.C.] touched her pee pee." Mother cannot give a date, time or much in the way of specifics, as to how the spontaneous statements have happened, but indicated that her [sic] and her boyfriend have witnessed these statements.

The Western Pennsylvania Cares Center ("the Center") is a child advocacy center that was established for abused or suspected abused, child interviews. . . .

Juvenile Court Opinion, 5/29/12, at 1–2.

After an adjudicatory hearing, the juvenile court adjudicated N.C. delinquent of the above-stated charge. The juvenile court ordered that N.C. be placed on probation for one year, to be served consecutive to a probation violation disposition imposed in a different case. Thereafter, N.C. filed the instant timely appeal.

On appeal, N.C. presents the following claims for our review:

I. Whether the [juvenile] court erred in admitting into evidence [A.D.'s] testimonial out-of-court recorded statement made to a forensic interviewer, because [N.C.'s] rights conferred by the Confrontation Clauses of the 6th Amendment to the United States Constitution and Article 1, Section 9 of the Commonwealth of Pennsylvania's Constitution

were violated when [N.C.] was denied the right to confront the child witness/complainant with cross[-]examination?

II. Whether [N.C.'s] rights conferred by the Confrontation Clauses of the 6th Amendment to the United States Constitution and Article I, Section 9 of the Commonwealth of Pennsylvania's Constitution were violated by the [juvenile] court's admitting into evidence the child witness complainant's testimonial out-of-court recorded statement made to a forensic interviewer after the child witness was excused?

III. Whether the [juvenile] court erred in admitting into evidence the out-of-court recorded statements of the child witness to the forensic interviewer under the [The Tender Years Hearsay Act ("TYHA")] Exception, 42 Pa.C.S.A. § 5985.1, which required the Commonwealth to produce the child witness to testify or the Court to find the child witness to be unavailable?

Brief for Appellant at 6.

N.C. challenges the admissibility of the recorded forensic interview of A.D. Brief for Appellant at 18. Specifically, N.C. claims that the admission of A.D.'s recorded statement violated his right to confrontation afforded by the Sixth Amendment to the United States Constitution. *Id.* N.C. argues that A.D.'s statements during the interview were testimonial in nature, as they were procured at a police arranged interview, which was conducted for the purpose of eliciting statements to be used during the prosecution of N.C. *Id.* at 19. Specifically, N.C. states that A.D. was interviewed by a forensic interviewer at the request of the police. *Id.* Further, N.C. argues that a county detective, the investigating officer and a representative of Chil-

dren and Youth Services ("CYS") watched the interview in a separate room, "on 'real time' television." *Id.* Finally, N.C. argues that A.D. was so disengaged during her trial testimony as to be unavailable, effectively depriving N.C. of his Sixth Amendment right of confrontation. *Id.* at 20.

■ Under the TYHA, certain out-of-court statements made by a child victim or witness may be admissible at trial if the child either testifies at the proceeding or is unavailable as a witness, and the court finds "that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability." 42 Pa.C.S.A. § 5985.1(a)(1). However, as discussed *infra,* with regard to testimonial hearsay, United States Supreme Court case law has rejected the indicia of reliability standard as violative of the Sixth Amendment to the United States Constitution.

■ The Sixth Amendment to the United States Constitution, otherwise known as the Confrontation Clause, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[1] U.S. Const. amend. VI. Previously, in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court held that the Confrontation Clause did not bar admission of an unavailable witness's statement against a criminal defendant, provided the statement was surrounded by "adequate indicia of reliability." *Id.* at 66, 100 S.Ct. 2531. According to the *Roberts* Court, such indicia exists when the testimony being considered either fits within a "firmly rooted hearsay exception," or contains "particularized guarantees of trustworthiness." *Id.*

■ Subsequently, in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354,

---

1. The same protection is contained in Article 1, Section 9 of the Pennsylvania Constitution.

158 L.Ed.2d 177 (2004), the United States Supreme Court overruled *Roberts* in part. Specifically, the Supreme Court rejected the "indicia of reliability standard" where a witness is deemed unavailable. Instead, the Supreme Court held that the admissibility of out-of-court statements by an unavailable witness turns upon a determination of whether the statements are testimonial or nontestimonial in nature:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. **Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.**

*Id.* at 68, 124 S.Ct. 1354 (emphasis added).

With these standards in mind, we review the juvenile court's determinations that (a) A.D. was available at the adjudicatory hearing for cross-examination; and (b) the recorded forensic interview of A.D. was admissible as evidence.

In its Opinion, the juvenile court determined that A.D. was available to testify, but "less than forthcoming when asked to talk about [N.C.] and whether he had hurt or touched her." Juvenile Court Opinion, 10/17/12, at 1. According to the juvenile court, A.D. was therefore

available for 6th Amendment, Article I, Section 9 and [TYHA] purposes and could have been cross-examined about both what she indicated in Court and her statements and actions during the forensic interview.

Apparently concluding that it would be futile to do so, [defense] counsel elected

not to question the girl. The child's reticence during direct examination and counsel's decision not to cross-examine her did not render her unavailable for legal or constitutional purposes, howeverer. Thus, it was not error for the [c]ourt to admit the video and the child's hearsay statements to the forensic interviewer. . . .

*Id.* The evidence of record, however, does not support the juvenile court's determination that A.D. was available for Sixth Amendment purposes.

■ The record reflects that A.D. was four years old at the time of the adjudicatory hearing. N.T., 5/10/12, at 8. In the portion of the hearing on A.D.'s competence to testify, the record reflects that defense counsel was able to elicit nonverbal and infrequent verbal responses from A.D. *Id,* at 22–23. During direct examination on the facts at issue, however, A.D. was unable to provide testimony regarding the incident. When asked whether she liked N.C., A.D. shook her head. *Id,* at 27. When asked whether she had ever been at the same house as N.C., A.D. again shook her head. *Id.* When asked to identify N.C., A.D. gave no response. *Id,* at 26. After a break, A.D. shook her head in the negative when asked whether (a) she had ever played games with N.C.; (b) whether N.C. had ever touched her; and (c) whether she wanted to talk about the incident. *Id,* at 35. In fact, A.D. either shook her head in denial or gave no response when repeatedly asked whether N.C. had ever touched her. *Id,* at 35, 36.

Eventually, N.C.'s counsel objected to the continued questioning of A.D.:

Just for the record, . . . I would like to note our objection to continuing the questioning in the face of the child's obvious assertions that she doesn't want to participate. She wants to go home.

She's not responsive to [the prosecutor's] questioning to any degree that's being helpful to the relevant facts of this particular case. It is our position that to continue to cajole her or otherwise to force her into answering questions is rapidly approaching a coercive situation with this young child. And unless there's some particular reason why we should continue this, we would simply have to object to any continued type of coercion into forcing her into answering questions.

*Id.* at 40. The juvenile court overruled the objection. *Id.* at 42.

Upon returning to the stand, when the prosecutor again attempted to elicit testimony from A.D. regarding the incident, the child became nonresponsive, curling up into a fetal position. *Id.* at 44–45. At that point, in time, the following discussion transpired:

[The prosecutor]: Your Honor, let the record reflect that [A.D.] is curling up in a fetal position into a ball[.]

THE COURT: The record will reflect that.

Q. [The prosecutor]: Honey, is [N.C.] nice?

A. [A.D.]: (No response).

[The prosecutor]: She's further curling up in a ball.

THE COURT: The record will reflect that.

[The prosecutor]: Your Honor, I don't know if the Court wants to inquire at all. **I don't think I'm going to get anywhere.**

THE COURT: [To the child] ... [C]an you look at me? ... [A.D.] is not acknowledging me so, ... [to defense counsel] why don't you go ahead and take her.

... [D]o you have any questions?

[Defense counsel]: No.

THE COURT: Okay. Just wanted to get that clear before I entertain—okay. Go ahead. I think I will, for the record, I mean, my position in calling her was to see if she would testify so we don't have to inquiry [*sic*] what went on in the break, **but she's not going to testify.**

*Id.* at 45–46 (emphasis added).

Thus, A.D. refused to testify about the incident *on direct examination* and eventually was unable to provide *any* response to the prosecutor's questions. Based upon the record before us, we conclude that the juvenile court improperly deemed A.D. "available" for purposes of the Sixth Amendment. The record simply does not support a determination that A.D. was available for cross-examination by defense counsel.

Because A.D. was unavailable for cross-examination, we next review whether the juvenile court properly admitted the recording of A.D.'s forensic interview into evidence. The TYHA provides the following regarding the admissibiliy of statements made by a child:

**General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in [18 Pa.C.S.A., chapter 31, relating to sexual offenses], not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an *in camera* hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a). Here, where A.D. was unavailable for cross-examination, the TYHA would permit the admission of her out-of-court statements under the indicia of reliability standard.

 As set forth above, the United States Supreme Court rejected the indicia of reliability standard in *Crawford*. *See Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 (recognizing that "[a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation"). As required by *Crawford*, a Confrontation Clause analysis of A.D.'s out-of-court statements requires a determination of whether the statements were testimonial in nature.

[I]n analyzing whether a statement is testimonial, and, therefore, subject to the protections of the Confrontation Clause under *Crawford*, a court must determine whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution. In making the determination as to the primary purpose of an interrogation, a court first should determine whether the interrogation occurred during the existence of an ongoing emergency, or what was perceived to be an ongoing emergency. Although the existence—actual or perceived—of an ongoing emergency is one of the most important factors, this factor is not dispositive because there may be other circumstances, outside of an ongoing emergency, where a statement is obtained for a purpose other than for later use in criminal proceedings. In determining the primary purpose of an interrogation, a court must also objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant.

*Commonwealth v. Allshouse*, 614 Pa. 229, 36 A.3d 163, 175–76 (2012) (citation omitted) (applying *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

At the adjudicatory hearing, the Commonwealth presented evidence that Mother reported the November 5, 2011 incident within one week of its occurrence. N.T., 4/13/12, at 45. At that time, Mother spoke with Brockway Police Chief Terry Young ("Chief Young"). *Id*, at 67–68. A.D. never personally discussed the incident with any law enforcement official prior to trial. *Id*, at 68. Chief Young informed Mother that Pat Berger ("Berger"), a forensic interviewer from the Center, would interview A.D. and record the interview. *Id*, at 70–71. Chief Young telephoned Berger on November 11, 2011, to arrange the interview. *Id*, at 127.

On November 23, 2011, Mother took A.D. to the Center. *Id*, at 73. According to Mother, the Center was like a house. *Id*, at 86. Upon arriving at the Center, Mother and A.D. waited in a "little living room" that had toys to keep A.D. occupied. *Id*, at 86–87. Also present at the Center were Berger, Chief Young, Police Detective Guy Felmlee ("Detective Felmlee") and a CYS representative. *Id*, at 76. Prior to beginning the interview, Mother met with Berger and the CYS representative. *Id*, at 78.

As described by Berger, the Center conducts a forensic interview of the child victim, with all agencies present at the interview. *Id*, at 97. Berger described a forensic investigator as

[a] neutral party who interviews a child regarding possible abuse allegations which can be physical or sexual or witness to violent crime; and ... through the protocol, the child gives a narrative about what has happened, in most cases.

Now, a three-year-old, two-year-old, it's a little hard to get a narrative.

*Id.* at 132.

Berger indicated that in addition to the room in which the child would be interviewed, the Center provides a conference room with a large-screen television where a "team" watches the interview. *Id,* at 105. Representatives from law enforcement are part of that team. *Id,* at 106–07. Family members, however, are not invited to watch the interview. *Id,* at 106.

During her interview of A.D., Berger acknowledged that she stepped out and consulted with the investigative team, which included Chief Young and Detective Felmlee. *Id,* at 135. Berger confirmed that in conducting the interview, she obtained assistance from the police department and CYS. *Id.* at 137. Thereafter, Berger provided the district attorney's office and Chief Young with a DVD recording of the interview. *Id,* at 151.

■ Thus, the record reflects that the interview took place nineteen days after the incident. There is no evidence that the interview took place during the existence of an ongoing emergency. The record reflects no evidence that A.D.'s statements were obtained for a purpose other than for later use in criminal proceedings. The statements were not used for treatment purposes.[2] While the interview was conducted in an informal setting, the record reflects that the interview was conducted as part of the criminal investigation, and in consultation with law enforcement officials. Moreover, the interview was the only means by which law enforcement officials gathered evidence from A.D. for the criminal prosecution of N.C. Based upon the evidence of record, A.D.'s statements at the interview were testimonial in nature.

■ In summary, the record reflects that (a) A.D. was not available at trial for cross-examination by N.C.; (b) the forensic interview was testimonial in nature; and (c) N.C. did not have the opportunity to cross-examine A.D. during the interview. Under these circumstances, we conclude that the admission of A.D.'s recorded statements violated N.C.'s right of confrontation, as provided by the Sixth Amendment to the United States Constitution. *See Davis,* 547 U.S. at 822, 126 S.Ct. 2266; *Allshouse,* 36 A.3d at 175–76. Accordingly, the juvenile court erred in admitting A.D.'s recorded statements into evidence during the adjudicatory hearing. On that basis, we vacate the disposition and remand for a new adjudicatory hearing.

N.C.'s remaining claims also challenge the admissibility of A.D.'s recorded statements. As we have concluded that the juvenile court erred in admitting the recorded statements, we need not address the remaining claims.

Disposition vacated; case remanded for a new adjudicatory hearing consistent with this Opinion; Superior Court jurisdiction relinquished.

---

**2.** At the conclusion of the interview, Mother was advised to seek a medical examination from a doctor. N.T., 4/13/12, at 80–81.